UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOHN ROGERS,<br>    Plaintiff, | : | CIVIL ACTION NO.<br>3:16-CV-1299 (JCH) |
| v. | : | |
| SCOTT SALIUS, et al.,<br>    Defendants. | : | APRIL 12, 2017 |

**RULING ON DEFENDANTS' MOTION TO DISMISS (Doc. No. 25)**

The plaintiff, John Rogers ("Rogers"), currently incarcerated at Northern Correctional Institution in Somers, Connecticut, has filed an Amended Complaint (Doc. No. 23) pro se under section 1983 of title 42 of the United States Code. The defendants named in the Amended Complaint are Captain Scott Salius ("Salius"), Officer Jared Grasso ("Grasso"), Nurse Barbara LaFrance ("LaFrance"), Counselor Angela Maiorana ("Maiorana"), Counselor Damian Doran ("Doran"), Officer Shepard ("Shepard"), Dr. Syhed Johar Naqvi ("Dr. Naqvi"), Director of Security Kimberly Weir ("Weir") and Deputy Warden Jesus Guadarrama ("Guadarrama"). Rogers seeks damages as well as declaratory and injunctive relief from the defendants for violation of his constitutional rights. The defendants have filed a Motion to Dismiss (Doc. No. 25). For the reasons that follow, the defendants' Motion is **GRANTED** as to the request for injunctive relief and **DENIED** in all other respects.

**I.     STANDARD OF REVIEW**

To withstand a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. The plausibility standard is not a probability requirement; the pleading must show, not merely allege, that the pleader is entitled to relief. Id. Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. Id. However, when reviewing a motion to dismiss, the court must draw all reasonable inferences in the non-movant's favor. Graziano v. Pataki, 689 F.3d 110, 114 (2d Cir. 2012).

**II.   FACTS**

The incidents underlying this action occurred while Rogers was confined in the Security Risk Group ("SRG") Phase Program at the MacDougall-Walker Correctional Institution ("MacDougall"). See Am. Compl. ¶ 11. In 2012, Rogers renounced his SRG affiliation. See id. ¶ 11. He remained inactive during the events underlying this action. See id. ¶ 11. Inmates in the SRG Program attend recreation with their hands cuffed behind their backs. See id. ¶ 11. They recreate with other members of the SRG with which they are affiliated. See id. ¶ 11.

2

Between 2010 and 2013, Rogers told defendant Weir multiple times that he was concerned for his safety. See id. ¶ 12. He submitted many requests to be transferred to protective custody, which requests defendant Weir denied. See id. ¶ 12. Instead, Rogers was placed on rec-alone status. See id. ¶ 12. In 2012, Rogers completed the SRG Program at Northern Correctional Institution. See id. ¶ 12.

In 2013, Rogers was re-affiliated with the SRG Crips and transferred to MacDougall, the facility at which the SRG Program was then located. See id. ¶ 13. Rogers again requested protective custody. See id. ¶ 13. Defendant Weir denied the request even though she knew that, when the program was relocated, rec-alone status was discontinued. See id. ¶ 13.

In September 2013, other Crips members told Rogers to assault another inmate. See id. ¶ 14. He refused, claiming he was inactive. See id. ¶ 14. As a result of the refusal, the Crips put a "hit" on Rogers. See id. ¶ 14. Defendant Shepard intercepted a note about the hit being passed between two Crips members and gave the note to defendants Salius, Doran and Guadarrama. See id. ¶ 15. They did not remove Rogers from Crips recreation. See id. ¶ 15. Sometime later, Doran told Rogers that he "found this month[']s hit list," but the information meant nothing to Rogers. See id. ¶ 16.

On October 31, 2013, defendant Grasso was supervising Crips recreation. See id. ¶ 17. He applied handcuffs to each inmate and escorted them to the recreation yard. See id. ¶ 17. Rogers believes that while Grasso was assigned to the SRG unit, several inmates had manipulated their restraints and used the handcuffs as weapons to assault other inmates. See id. ¶ 18.

On October 31, 2013, one inmate slipped his handcuffs and used them to assault Rogers while another inmate kicked and stomped Rogers in the head, neck and face. See id. ¶ 19. Right before the assault, Rogers claims that defendant Grasso saw the inmate slip his handcuffs and told him to "make it quick and get on the ground when I call the code." See id. ¶ 20. Rogers was unable to protect himself and suffered multiple injuries. See id. ¶ 21.

Following the assault, Rogers was seen in the medical unit where he received stitches. See id. ¶ 22. Rogers complained about dizziness and pain in his neck and face, but Dr. Naqvi did not address these claims. See id. ¶ 22. Rogers returned to the housing unit and was placed in the same cell, with another Crips member. See id. ¶ 23. Defendants Salius, Doran and Maiorana told Rogers about finding the note and learning about the hit. See id. ¶ 23. Defendant Grasso approached Rogers and tried to explain that he did not set Rogers up. See id. ¶ 24. He asked Rogers not to sue him. See id. ¶ 24.

A few days later, Rogers felt a pop or crack at the base of his neck and his left arm became numb. See id. ¶ 25. Dr. Naqvi prescribed Flexeril, a muscle relaxant, for a few days. See id. ¶ 26. He said the condition was not serious and thought Rogers had slept wrong. See id. ¶ 26. Rogers disagreed with the diagnosis. See id. ¶ 26. Following the incident, the medical unit ignored Rogers' complaints. See id. ¶ 27. Nurse LaFrance denied Rogers' requests for pain medication and, when he told her about the assault, told him he was overreacting. See id. ¶ 27. She told him she would order an x-ray, but he did not get one. See id. ¶ 27.

On February 20, 2014, Rogers went to the medical unit. See id. ¶ 28. He complained of numbness and problems sleeping and an inability to turn his head to the left without experiencing shooting pain down his back. See id. ¶ 28. He was denied a meeting with Nurse LaFrance. See id. ¶ 28. Later on February 20, 2014, Rogers lay down on the cell floor to "manipulate a medical code" to obtain medical assistance. See id. ¶ 29. Defendant Maiorana came to his cell and told him to stop faking. See id. ¶ 29. When Rogers would not get up, a lieutenant called a medical code. See id. ¶ 29. Rogers was sent to St. Francis Hospital for an x-ray, CAT scan and MRI. See id. ¶ 30.

The tests showed that Rogers had suffered trauma to his neck, specifically a fracture at T1 and disc bulges at C4 and C5. See id. ¶ 31. Rogers was admitted because he required surgery to have a screw inserted into his neck. See id. ¶ 32. He was discharged the following day because the Department of Corrections' contract for medical services was with the University of Connecticut, not St. Francis Hospital. See id. ¶ 33.

Upon his return to MacDougall, defendants Salius and Maiorana stated that they knew what Rogers had done. See id. ¶ 34. A few days later, defendant Maiorana told other inmates that Rogers was a snitch and that he was afraid of the Crips. See id. ¶ 35.

Rogers' medical needs were ignored until June 24, 2014, when he was sent to the University of Connecticut Health Center for an MRI. See id. ¶¶ 36–38. Nothing was done to address Rogers' injuries. See id. ¶ 38. On July 3, 2014, Rogers discharged from custody without his medical needs being addressed. See id. ¶ 39.

## III. ANALYSIS

Rogers asserts three claims in the Amended Complaint: (1) defendants Salius, Maiorana, Doran, Shepard, Guadarrama and Weir were deliberately indifferent to his safety, see id. ¶ 43; (2) defendants LaFrance and Dr. Naqvi were deliberately indifferent to his serious medical needs, see id. ¶ 44; and (3) defendants Salius, Grasso, Maiorana, Doran, Shepard, Guadarrama and Weir failed to protect him from harm, see id. ¶ 45. He seeks damages from all defendants, a declaration that the defendants violated his rights and an injunction preventing the use of handcuffs at recreation. See id. ¶¶ 46–49.

In the Initial Review Order (Doc. No. 7), the court dismissed the claims against defendant Maiorana without prejudice to Rogers filing an amended complaint if he could allege facts showing that defendant Maiorana was involved in a failure to protect him from harm or was deliberately indifferent to Rogers' safety. See Initial Review Order at 11. Rogers has included new allegations against defendant Maiorana in the Amended Complaint. See Am. Compl. ¶¶ 23, 29, 34–35.

The defendants move to dismiss[1] on the grounds that Rogers fails to allege facts supporting cognizable claims, that the defendants are protected by qualified immunity, and that the court lacks subject matter jurisdiction. See Defs.' Mem. (Doc. No. 25-1) at

---

[1] Rogers attaches various Exhibits (Doc. No. 28-1) to his Memorandum in Opposition to the Motion to Dismiss (Doc. No. 28-2). If the court were to consider the Exhibits, it would be required to convert the Motion to Dismiss to a motion for summary judgment. See Fed. R. Civ. P. 12(d) (providing that if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment…."). The court declines to consider Rogers' Exhibits.

6

1. They rely on the dismissal of the claims against defendant Maiorana in the original Complaint (Doc. No. 1) and do not acknowledge the new allegations against defendant Maiorana in their Motion. See Defs.' Mem. at 1.

### A.     Conclusory Allegations

The defendants first argue that the Amended Complaint must be dismissed because Rogers' allegations are conclusory and fail to state a plausible claim for relief. See id. at 4. The court disagrees. Rogers specifically alleges that defendants Shepard, Salius, Doran, Maiorana and Guadarrama were aware of the hit on Rogers before the assault occurred. See Am. Compl. ¶¶ 15, 23. He also alleges that defendant Grasso was present and permitted the assault to occur. See id. ¶¶ 17, 20. Regarding defendant Weir, Rogers alleges that during a prior SRG placement, defendant Weir had ordered that Rogers recreate alone in response to his concerns for his safety. See id. ¶ 12. Although Rogers again expressed the same concerns, defendant Weir did nothing prior to the 2013 assault. See id. ¶ 13. Rogers also includes specific allegations about the injuries he suffered during the assault and the results of hospital tests. See id. ¶¶ 21–22, 25, 28, 31.

Rogers included these same allegations in the original Complaint. In the Initial Review Order, the court determined that these allegations were sufficient to state plausible claims. See Initial Review Order at 9–11. The defendants' disagreement with the court's assessment does not warrant dismissal of the Amended Complaint.

B.  Injunctive Relief

The defendants next contend that Rogers cannot meet the requirement to obtain injunctive relief in this case.  See Defs.' Mem. at 5.  To state a claim for permanent injunctive relief, Rogers must plausibly allege that he will suffer irreparable harm should the injunction be denied as well as actual success on the merits of his claim.  See Oginbene v. Parkes, 671 F.3d 174, 182 (2d Cir. 2012).  Irreparable harm requires an "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages."  Daniels v. Murphy, No. 3:11CV286 (SRU), 2013 WL 587005, at *3 (D. Conn. Feb. 12, 2012) (quoting Forrest City Daly Housing, Inc. v. Town of North Hempstead, 175 F.3d 144, 153 (2d Cir. 1999) (internal quotation marks omitted)).

Furthermore, for Article III standing "[t]o obtain prospective relief, such as" the "injunction" Rogers seeks, Rogers "must show, inter alia, a sufficient likelihood that he [ ] will again be wronged in a similar way."  Marcavage v. City of N.Y., 689 F.3d 98, 103 (2d Cir. 2012) (internal quotation marks omitted).  This standing requirement implicates the court's subject matter jurisdiction.  Id. at 103.

The incident underlying this action occurred in 2013, while Rogers was confined in the SRG Phase Program at MacDougall.  See Am. Compl. ¶¶ 13, 17.  He did not file this action until 2016.  Rogers seeks an order that handcuffs not be used during recreation.  See id. ¶ 47.  As he alleges no facts suggesting that inmates are otherwise handcuffed during recreation, the court assumes that Rogers means recreation for inmates in the SRG Phase Program at MacDougall.  The factual allegations in Rogers's

8

Amended Complaint conclude by stating that he was discharged from MacDougall. See id. ¶ 39. While the factual allegations in the Amended Complaint begin by alleging that Rogers "is housed" in the SRG Phase Program at MacDougall, see id. ¶11, the court takes judicial notice of the fact that Rogers's address on record with the court is Northern, not MacDougall, see Docket Sheet in Case No. 16-cv-1299, as well as the fact that the Connecticut Department of Corrections Inmate Lookup website currently lists John Rogers as incarcerated at Northern.[2] Rogers's allegation that he is currently at the SRG Phase Program at MacDougall is thus not plausible. Additionally, Rogers has not plausibly alleged that, absent actions within his control demonstrating SRG activity, he will be required to complete the program in the future. The court concludes that Rogers has not plausibly alleged any facts suggesting that he will suffer irreparable harm should permanent injunctive relief be denied. Thus, the defendants' Motion to Dismiss is **GRANTED** as to the request for injunctive relief.

C. Failure to Protect

The defendants argue that Rogers does not state a failure to protect claim. Prison officials have a duty to make reasonable efforts to ensure inmate safety. See Farmer v. Brennan, 511 U.S. 825, 832 (1994). This duty includes protecting inmates from harm at the hands of other inmates. See id. at 833; Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997). To establish a constitutional violation, an inmate must show that the conditions of his incarceration posed a substantial risk of serious harm and that

---

[2] Available at http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=348126. Last accessed April 4, 2017.

prison officials were deliberately indifferent to his safety. See Farmer, 511 U.S. at 834. Deliberate indifference exists where prison officials know of and disregard an excessive risk to inmate safety. See id. at 837; Bridgewater v. Taylor, 698 F. Supp. 2d 351, 357 (S.D.N.Y. 2010) (explaining that defendants must be aware of facts supporting an inference that harm would occur and must actually draw that inference). "For example, correctional staff would be on notice of a substantial risk of serious harm where there has been prior hostility between inmates, or a prior assault by one inmate on another, and those inmates are not kept separated." Roman v. Semple, No. 3:13-CV-305 (JBA), 2013 WL 951728, at *1 (D. Conn. Mar. 12, 2013) (citing Ayers v. Coughlin, 780 F.2d 205, 209 (2d Cir. 1985)).

A negligent failure to protect prisoners from harm, however, is not cognizable under section 1983. See Davidson v. Cannon, 474 U.S. 344, 347–48 (1986). In addition, if a prison official "actually knew of a substantial risk to inmate health or safety," but responded in a reasonable manner to that risk, he "may be found free from liability" under the Eighth Amendment, "even if the harm ultimately was not averted." Farmer, 511 U.S. at 844. When "determining whether a substantial risk of harm existed, the Court should not assess a prison official's actions based on hindsight but rather should look at the facts and circumstances of which the official was aware at the time he acted or failed to act." Hartry v. County of Suffolk, 755 F. Supp. 2d 422, 436 (E.D.N.Y. 2010) (citations and internal quotation marks omitted).

Rogers alleges that defendants Shepard, Salius, Doran, Maiorana and Guadarrama were aware of the hit on Rogers before the assault occurred and that

Salius, Doran, and Maiorana communicated that fact to him. See Am. Compl. ¶¶ 15, 23. He also alleges that defendant Grasso was present and permitted the assault to occur and also tried to deny his complicity in a conversation with Rogers. See id. ¶¶ 20, 24. In addition, Rogers alleges that during a prior SRG placement defendant Weir had ordered that Rogers recreate alone in response to his concerns for his safety. See id. ¶ 12. Although Rogers again expressed the same concerns, defendant Weir did nothing prior to the 2013 assault. See id. ¶ 13. In the Initial Review Order, the court determined that these allegations were sufficient to state a plausible claim for failure to protect against defendants Shepard, Salius, Doran, Guadarrama, Grasso and Weir. See Initial Review Order at 10. As Rogers has now alleged facts regarding defendant Maiorana, he also states a plausible claim against her.

Again, the defendants disagree with the court's determination that Rogers set forth plausible failure to protect claims. See Defs.' Mem. at 9. The defendants contend that Rogers fails to allege that they were aware of a conflict that posed a heightened risk to Rogers' safety and emphasize that he did not identify his assailants to any defendant. See id. at 12–13.

The allegation that defendants intercepted a note putting a hit on Rogers, especially when combined with the allegation that the defendants acknowledged that they understood the purpose of the note, is sufficient to plausibly allege that the defendants were aware of a threat to Rogers' safety. In addition, although Rogers does not allege facts supportive of an inference that defendant Weir was aware of the hit, his allegations, if proven, would support an inference that she accepted his prior complaints

11

as evidence of a threat to safety sufficient to warrant action in the form of a rec-alone order. Rogers expressed the same safety concern during this placement in the SRG program. Thus, the Amended Complaint plausibly alleges that defendant Weir was aware of a threat to Rogers' safety sufficient to warrant some action, but took none. Whether Rogers can present sufficient evidence to prevail at trial or on a motion for summary judgment is not the issue before the court. At this time, the court need only determine whether Rogers has alleged sufficient facts to support a plausible failure to protect claim.

The defendants also argue that the allegations are infirm because Rogers did not submit the incident report. See Defs.' Mem. at 13. The Federal Rules of Civil Procedure require only notice pleading. Rule 8 requires only a "short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2). There is no requirement that documentary evidence be submitted along with the complaint.

D. Deliberate Indifference to a Serious Medical Need

The defendants argue that defendants Dr. Naqvi and LaFrance were not deliberately indifferent to Rogers' serious medical needs. Defs.' Mem. at 23–26.

"The Eighth Amendment forbids deliberate indifference to serious medical needs of prisoners." Spavone v. N.Y. State Dep't of Corr. Servs., 719 F.3d 127, 138 (2d Cir. 2013) (internal quotation marks omitted). To establish a claim for deliberate indifference to a serious medical need, Rogers must allege facts demonstrating two elements. The first element is objective; "the alleged deprivation of adequate medical care must be sufficiently serious." Spavone, 719 F.3d at 138 (internal quotation marks omitted).

12

Under this objective element, a court must determine first, "whether the prisoner was actually deprived of adequate medical care," and second, "whether the inadequacy in medical care is sufficiently serious." Salahuddin v. Goord, 467 F.3d 263, 279–80 (2d Cir. 2006). Adequate medical care is reasonable care such that "prison officials who act reasonably cannot be found liable." Farmer, 511 U.S. at 845. Rogers also must allege facts showing that his medical needs, "either alone or in combination, pose an unreasonable risk of serious damage to his health." Darnell v. Pineiro, 849 F.3d 17, 30 (2d Cir. 2017); Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013). "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003). Nevertheless, the Second Circuit has presented "a non-exhaustive list" of factors to consider: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" Id. (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)); see also Black v. Petitinato, No. 16-CIV-3941 (BMC) (RLM), 2016 WL 3983590, at *3 (E.D.N.Y. July 25, 2016) (quoting Chance).

In considering deliberate indifference claims, courts distinguish between situations where no medical attention is given and situations where medical attention is given, but is objectively inadequate. In the former, the court need only "examine whether the inmate's medical condition is sufficiently serious." Salahuddin, 467 F.3d at 280. In the latter, however, the inquiry is "narrower"; for example, "if the prisoner is

13

receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'" Id. (quoting Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003)).

The second element is subjective; the defendants "must be subjectively reckless in their denial of medical care." Spavone, 719 F.3d at 138; see also Darnell, 849 F.3d at 32–33 (explaining that "deliberate indifference is properly equated with the mens rea of 'recklessness,'" and that the Cruel and Unusual Punishments Clause has a "subjective intent" requirement). The inquiry is whether defendants "knew of and disregarded an excessive risk to [a plaintiff's] health or safety" while "both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and also drew the inference." Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009) (alterations and internal quotation marks omitted), overruled on other grounds by Darnell, 849 F.3d 63; see also Farmer, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). The defendants must have acted or failed to act "while actually aware of a substantial risk that serious inmate harm will result." Nielsen v. Rabin, 746 F.3d 58, 63 (2d Cir. 2014) (internal quotation marks omitted). In contrast, "mere medical malpractice is not tantamount to deliberate indifference," unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison [medical professional] that evinces a conscious disregard of a substantial risk of serious harm." Chance, 143 F.3d at 703 (internal quotation marks

and citation omitted). Further, "mere disagreement over the proper treatment does not create a constitutional claim," and "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." Id.; Rodriguez v. Cty. of Westchester, No. 15-CIV.-9626 (PAE), 2017 WL 118027, at *8 (S.D.N.Y. Jan. 11, 2017).

The defendants first argue that Rogers has not alleged facts demonstrating a serious medical need. See Defs.' Mem. at 20. Rogers alleges that the tests at St. Francis Hospital showed a fracture at T1 and disc bulges at C4 and C5. See Am. Compl. ¶ 31. The doctor there admitted Rogers and was going to perform surgery immediately, but did not do so because there was no contract for medical services between the Department of Correction and St. Francis Hospital. See id. ¶¶ 32–33. In addition, Rogers alleges that the condition caused him "extreme," "excruciating," "constant," "throbbing," "exploding," and "shooting" pain, which prevented Rogers from sleeping, from "sit[ting] up in bed without help" and from "turn[ing] his head more than a few inches to the left." See id. ¶¶ 22, 27–28, 36. Rogers continued to experience pain for at least eight months. See id. ¶¶ 27, 36, 39 (explaining that Rogers continued to ask prison staff for help regarding Rogers' ongoing pain from the time of his assault in October 2013, until June 2014, and that he was discharged on July 3, 2014, with his "injuries still unfixed"). Rogers also alleged that the "tingling . . . and numbness" in his arm "affect[ed] his daily routine" by interfering with his ability to write. See id. ¶ 28; see also id. at 36 (stating that Rogers "continued to have issues . . . doing daily routines"). Thus, Rogers has alleged facts meeting all three of the Brock factors set forth above:

15

(1) a doctor at St. Francis Hospital evidently "perceive[d] the medical need in question as 'important and worthy of [ ] treatment,'" as would any "reasonable doctor or patient," due to the severity of the condition Rogers describes, (2) Rogers' "medical condition significantly affect[ed] daily activities," namely, his abilities to sleep, sit up in bed, turn his head, and write, and (3) Rogers' "pain" was both "chronic and substantial." See 315 F.3d at 162; see also Smith v. Carpenter, 316 F.3d 178, 185 n.8 (2d Cir. 2003) (referring to pain that lasts six months as "chronic"). The court concludes that Rogers has alleged sufficient facts to satisfy the sufficiently-serious element of the deliberate indifference standard. See, e.g., Baskerville v. Blot, 224 F. Supp. 2d 723, 734 (S.D.N.Y. 2002) (claim for failure to properly evaluate back and neck injuries resulting from assault allowed to proceed; accepting allegations as true, court held allegations are sufficient to survive a motion to dismiss even though they may not be supported by evidence at later stage of proceeding).

The defendants next contend that Rogers fails to allege sufficient facts to satisfy the subjective component of the deliberate indifference standard with regard to Dr. Naqvi and Nurse LaFrance. Defs.' Mem. at 21–26. Rogers alleges that, following the assault, Dr. Naqvi sutured his lacerations but ignored his complaints of head and neck pain and dizziness. See Compl. ¶ 22. When Rogers felt a pop in his neck a few days later and experienced numbness in his arm, Dr. Naqvi prescribed a muscle relaxant for a few days and dismissed the condition as not serious, merely a matter of sleeping the wrong way. See id. ¶¶ 25–26. When the muscle relaxant was ineffective, the medical unit, including Dr. Naqvi and Nurse LaFrance, refused any further treatment or pain

16

medication from early November 2013, though February 2014.  See id. ¶¶ 27–28.  On February 20, 2014, Rogers complained of numbness and shooting pain when he turned his head.  See id. ¶ 28.  He was provided no medical treatment.  See id. ¶ 28.  Later that day, Rogers was taken to the hospital where tests revealed bulging discs and a fractured vertebra, conditions serious enough to warrant immediate surgery.  See id. ¶ 30–32.  When Rogers was returned to the correctional facility, however, he received no treatment for four months.  See id. ¶¶ 36–39.  Nurse LaFrance did nothing in response to Rogers' many complaints of pain.  On June 24, 2014, Rogers was sent for an MRI, but nothing was done to address his injuries.  See id. ¶ 38.  As he discharged from custody less than two weeks later, the court can infer that the delays and failure to provide treatment were associated with Rogers' impending discharge.

The defendants characterize the claim as a disagreement regarding treatment.  See Defs.' Mem. at 21, 23–24.  Rogers alleges, however, that he was denied all treatment for his neck injuries following the initial examination after he heard the pop in his neck.  Rogers' allegations, accepted as true, plausibly allege that defendants Dr. Naqvi and LaFrance were aware of his complaints of numbness and pain and of the diagnosis from the doctor at St. Francis Hospital but provided no treatment.[3]  Where the claim is a denial of treatment, the court need only consider whether the medical need

---

[3] The defendants contend that Nurse LaFrance promised Rogers that she would order x-rays and x-rays were taken which helped diagnose his condition.  See Defs.' Mem. at 25.  The defendants ignore the fact that x-rays were not taken until Rogers was transported to St. Francis Hospital—and that Rogers only managed to get himself transported to St. Francis Hospital by manipulating a medical code, in an attempt to seek the medical treatment Rogers had been denied by LaFrance.  See Am. Compl. ¶¶ 29–30.  Nurse LaFrance had no part in ordering the x-rays and made no treatment decisions based on the x-ray results.

was serious.  See Salahuddin, 467 F.3d at 280.  As the court determined above that Rogers alleges sufficient facts to demonstrate a serious medical need, the defendants' Motion to Dismiss is **DENIED** as to the claims for deliberate indifference to a serious medical need.

      E.      Qualified Immunity

Finally, the defendants argue that they are protected by qualified immunity.  See Defs.' Mem. at 26.  Qualified immunity attaches when an official's conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)).  Although the Supreme Court's case law "'do[es] not require a case directly on point'" before a right is considered to be clearly established, "'existing precedent must have placed the statutory or constitutional question beyond debate.'"  Id.  308 (quoting Ashcroft v.al-Kidd, 563 U.S. 731, 741 (2011)).  Qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'"  Id. at 308 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  The Supreme Court has cautioned the lower courts many times that "'clearly established law' should not be defined 'at a high level of generality.'"  White v. Pauly, 137 S. Ct. 548, 552 (2017) (quoting al-Kidd, 563 U.S. at 742).  Rather, clearly established law "must be 'particularized' to the facts of the case."  Id. at at 552 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  In White, however, the district court had denied qualified immunity at summary judgment.  Id. at at 550.

The defendants assert qualified immunity on a Motion to Dismiss. "Although, 'usually, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted,' a district court may grant a Rule 12(b)(6) motion on the ground of qualified immunity if 'the facts supporting the defense appear on the face of the complaint.'" Hyman v. Abrams, 630 F. App'x 40, 42 (2d Cir. 2015) (quoting McKenna v. Wright, 386 F.3d 432, 435–36 (2d Cir. 2004)).

The court has concluded that Rogers alleged sufficient facts to state plausible claims for failure to protect him from harm and deliberate indifference to serious medical needs. If Rogers can present evidence to support those allegations, qualified immunity would not be warranted. The court should consider qualified immunity on a motion to dismiss with caution. Frequently the availability of qualified immunity is a fact-intensive decision and, if the facts are in dispute, a fully developed record on summary judgment may be needed to determine whether the factual dispute remains. See Birch v. City of New York, 184 F. Supp. 3d 21, 28 (E.D.N.Y. 2016) (advocating caution when considering qualified immunity on a motion to dismiss). As the defendants dispute Rogers' allegations, the court concludes that a decision on qualified immunity is premature. The defendants may revisit their argument at summary judgment.

## IV. CONCLUSION

The defendants' Motion to Dismiss (**Doc. No. 25**) is **GRANTED** as to the claim for injunctive relief and **DENIED** in all other respects.

The Clerk is directed to verify defendant Maiorana's current work address with the Department of Correction Office of Legal Affairs, mail a waiver of service of

summons packet containing the Amended Complaint and this Ruling and Order to defendant Maiorana at that address within **twenty-one (21) days** of this Order, and report to the court on the status of the waiver request on the thirty-fifth (35) day after mailing.  If defendant Maiorana fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S. Marshals Service on her in her individual capacity and the defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

**SO ORDERED.**

Dated this 12th day of April 2017 at New Haven, Connecticut.

 /s/ Janet C. Hall
Janet C. Hall
United States District Judge